UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Chardles O. Ogindo,

                          Plaintiff,

      v.                                          07-CV-1322

Lois DeFleur, et al.,

                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

        Plaintiff Charles Ogindo commenced the instant action against Defendants Lois DeFleur, John Eisch, David Doetschman, Alistair Lees, and Wayne Jones, Jr., asserting claims of a violation of his rights under 42 U.S.C. § 1981, violation of his constitutional rights to equal protection under the law and due process of law, copyright infringement, patent infringement, breach of contract, promissory estoppel, and fraud, arising out of his discharge from the Binghamton University Chemistry Department doctoral program and dismissal from Binghamton University.  Presently before the Court is Plaintiff's motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking judgment in his favor as a matter of law and Defendants' cross-motion for summary judgment seeking dismissal of the Amended Complaint in its entirety.

## I.     FACTS[1]

Plaintiff is black and a citizen of Kenya.  Commencing in 2002, Plaintiff was a graduate student in the Binghamton University Department of Chemistry.  Defendant John Eisch ("Eisch") is a distinguished professor of chemistry at Binghamton University (the "University") and was, at times relevant hereto, Plaintiff's advisor.  Defendant David Doetschman ("Doetschman") is a professor of chemistry at Binghamton University and, as is relevant hereto, served as the chair of the Chemistry Department.  Defendant Alistair Lees ("Lees") also is a professor of chemistry at Binghamton University who served as chair of the Chemistry Department.  Defendant Wayne Jones, Jr. ("Jones") is a professor of chemistry at Binghamton University and served as the Director of the Binghamton University Chemistry Department's Graduate Program Committee ("GPC").

Plaintiff entered the Binghamton University Chemistry Department graduate program in January 2002.  In December 2002, Plaintiff joined Eisch's group for doctoral dissertation research.  While at the University, Plaintiff was awarded a Clark Fellowship (the "Fellowship") in September 2002.  The Fellowship provided him with full tuition and a stipend.  Subject to certain limitations, the Fellowship was guaranteed through December 2006.  In May 2004, Plaintiff was admitted to candidacy for a doctoral degree.

Plaintiff alleges that:

On or about [the] middle of April 2005, Plaintiff completed doctoral research proposals and presented to Eisch by presentation of data, a proposed experiment

_____

[1] Many of the following facts are taken from Defendants' Statement submit pursuant to N.D.N.Y.L.R. 7.1(a)(3) in support of their motion for summary judgment.  Where Plaintiff failed to properly respond to Defendants' Statement of Material Facts with citations to the record where the factual issue arises, Defendants' facts are deemed admitted.  Further, although Plaintiff submitted various unsigned documents in support of his motion for summary judgment, the Court has considered all of his submissions (including his exhibits) notwithstanding the lack of signatures.

>   which would be a route to the Grubbs catalyst.[2]  Defendant Eisch would not allow Ogindo to perform this experiment, and shortly [thereafter], removed plaintiff from the project despite Ogindo's protests and pleas, and gave Ogindo a different project to reproduce forged work of Dutta and Eisch that purported that benzylic hydrogen could be activated and the carbon carbon bonds cleaved with procedures in Dutta's dissertation.

Pl.'s Rule 7.1(a)(3) Stmnt. at ¶ 13.  Defendants deny that Eisch instructed, encouraged or suggested that Plaintiff forge data.  In December 2005, Eisch requested that Plaintiff leave Eisch's laboratory due to purported poor performance.  Upon Plaintiff's request, Eisch placed Plaintiff on probationary status and gave Plaintiff another chance provided he agreed to work closely with an experienced, former student.

In or about January 2006, Plaintiff sought to take a teaching position at the State University of New York at Oneonta.  Plaintiff needed Eisch's permission to take the job.  Eisch declined to provide permission to Plaintiff.  Eisch reasonsed that "[s]ince under your Clark Fellowship you are working full-time at SUNY, you have no possibility of taking on a part-time position elsewhere that would make any demands on the full-time position that you had accepted in good faith for the present academic year."  Pl.'s Ex. at p. 60.  Eisch further concluded that the part time teaching position was not acceptable because Plaintiff's doctoral research performance had been unacceptable for a period of six months and Plaintiff previously expressed concern that teaching responsibilities were negatively affecting his progress on his doctoral research.  Id. at p. 61.

On January 31, 2006, after spending time working with the experienced, former student, Plaintiff wrote a letter to Eisch asking that his probationary status be "repealed."

---

[2] The "Grubbs' Catalyst" "is a transition metal carbene complex named after the chemist by whom it was first synthesized, Robert H. Grubbs."  http://en.wikipedia.org/wiki/Grubbs'_catalyst.

Plaintiff maintained that his probationary status should be repealed because his initial research efforts were correct. Citing various reasons why the probationary status was imposed, Eisch denied Plaintiff's request. Eisch informed Plaintiff that "[a]s I informed you, your Research Report No. 29 was very good and much improved. If you can continue such superior performance, you should be able to be restored to regular status in my laboratory." Id. at 65.

In July 2006, Eisch determined to terminate Plaintiff's participation in Eisch's research program and "vacate" his role as Plaintiff's research advisor. Id. at 82. In his letter, Eisch cited various reasons concerning Plaintiff's performance. Eisch instructed Plaintiff to "immediately cease any further laboratory experiments in any of my laboratories." Id. Eisch recommended that Plaintiff use his work to draft a thesis in support of a master of science degree.

Plaintiff then wrote to Jones rebutting the statements in Eisch's termination letter. Plaintiff requested Jones's assistance in obtaining copies of his laboratory notebooks from Eisch, obtaining a new advisor, and "reconstituting my committee for my doctoral dissertation defense this coming fall." Id. at p. 88. On July 31, 2006, Plaintiff received copies of his laboratory notebooks.

On several occasions, Plaintiff submitted manuscripts to certain journals for publication. The manuscripts were based on work Defendant performed in Eisch's laboratory. The manuscripts listed Plaintiff as sole author. The journals contacted Eisch to ascertain whether he was aware of the submissions. Eisch responded that we was not. The journals declined to publish the articles. Eisch filed a complaint against Plaintiff for submitting the manuscripts without his knowledge or permission. The GPC reviewed Eisch's

complaint and concluded that "Mr. Ogindo on three instances submitted work for publication or presentation without Professor Eisch's knowledge or consent.  The GPC believes these acts constitute serious professional and ethical transgressions."  Def.'s Ex. LLL.  The Committee recommended that Plaintiff be dismissed from the Ph.D. program.  The Chemistry Department faculty reviewed the GPC's recommendation and voted to table the recommendation that Plaintiff be dismissed.

The GPC worked out a proposed resolution to Plaintiff's grievance concerning his participation in the doctoral program whereby there would be an independent evaluation of Plaintiff's dissertation.  According to the proposed plan:

> The first evaluation would be made by a committee of Department faculty.  If this committee finds that the research has some merit as a PhD dissertation, the [GPC] would seek evaluation by an outside chemist specializing in the dissertation research.  If the outside evaluator sees merit as a PhD dissertation, Ogindo would defend the dissertation.  If the outside evaluator sees no merit as a PhD dissertation, or the internal committee decides it lacks merit for an external evaluator, Ogindo would be offered the possibility of writing and defending an MS thesis, or of accepting an MA.

Plaintiff agreed to the plan and withdrew his grievance, but attempted to reserve the right to reinstate it.

In September 2006, Plaintiff requested that his dissertation committee be "reconstituted."  In November 2006, Plaintiff submitted an initial draft of his dissertation.  On December 8, 2006, the Dissertation Committee concluded that the dissertation was not yet ready for filing because it was difficult to understand and "comes across as a 'data-dump.'"

The Committee's report specified additional problems with Plaintiff's initial draft. Plaintiff was afforded until February 22, 2007 to submit a revised dissertation.[3]

On or about February 5, 2007, Plaintiff submitted a revised, draft dissertation. Professor M. Stanley Whittingham, who served as the chair of Plaintiff's dissertation committee, advised Plaintiff that he wanted a rewrite rather than a corrected copy and that Plaintiff's draft was unacceptable. Thereafter, Plaintiff submitted a revised draft to the dissertation committee. Plaintiff was advised that the dissertation committee recommended that Plaintiff's revised dissertation be sent to an external reviewer. Plaintiff's dissertation was submitted to Professor Peter Wolczanski at Cornell University. Wolczanski reviewed Plaintiff's dissertation and opined that "the dissertation in no way constituted a Ph. D. thesis." Wolczanski Aff. at ¶ 5. Plaintiff was advised of the expert's conclusions. Defendants informed Plaintiff that he should consider writing a master's thesis for an M.S. degree or accept an M.A. degree based on his current work to date. On May 25, 2007, Jones sent Plaintiff an e-mail advising that the GPC would not consider Plaintiff's research as satisfying the requirements for the Ph.D. degree, but that Plaintiff could write a thesis for an M.S. degree or accept an M.A. degree.

Thereafter, Plaintiff indicated his desire to file a grievance. He also requested that he be permitted to defend his dissertation. Lees advised Plaintiff that the grievance could not be renewed because it had been resolved in accordance with the agreed-upon plan. Plaintiff was not permitted to defend his dissertation.

---

[3] In the meantime, Defendant Lees assisted Plaintiff in extending Fellowship funding (which was set to expire in December 2006) through the spring Semester of 2007.

In May 2007, Plaintiff delivered a document entitled "notice of intent to sue" to Defendants and certain other individuals. In July 2007, Plaintiff commenced an action against Defendants in New York State Supreme Court alleging breach of contract, fraud, and promissory estoppel. By Order dated October 24, 2007, Plaintiff's action was dismissed.

Plaintiff then sought to register for the fall 2007 semester. Plaintiff submitted an independent study course registration form. The form was approved by Jones. Plaintiff registered for one credit of "continuous registration" for the fall 2007 semester. Because Plaintiff had not been approved for Fellowship funding, Plaintiff was required to pay tuition and fees. Although Plaintiff was a registered student for the fall 2007 semester, he did not pay the fall 2007 tuition.

On December 19, 2007, Plaintiff commenced the instant litigation. In March 2008, Jones advised Plaintiff that he would be "severed" from the program for non-registration and non-payment. Plaintiff was informed that, to avoid being severed, he would need to register for one credit of "Chem 700" for the spring 2008 semester. Plaintiff submitted an independent study course registration form for the spring 2008 semester. This form was again approved by Jones. When an administrative assistant with the Chemistry Department attempted to register Plaintiff, she was unable to do so because Plaintiff failed to pay his Fall 2007 tuition. Plaintiff was advised that he could not register for the Spring 2008 semester until he paid his tuition arrears. Plaintiff did not pay the arrears.

Pursuant to applicable University policy, all students admitted into the Chemistry Department's graduate program must maintain continuous registration each semester. Students who do not maintain such registration are severed from the program. To be considered registered, students must pay all tuition and fees. Def.'s Ex. C. On March 26,

2008, the Graduate School sent Plaintiff a letter that he had been severed from the Graduate School because he did not enroll and/or pay for the Spring 2008 semester. Plaintiff did not register for the fall 2008 or spring 2009 semesters.

On June 6, 2008, Plaintiff filed an Amended Complaint. Defendants moved to dismiss the Complaint. On October 17, 2008, the Court dismissed all claims against Defendant DeFleur, dismissed the claims pursuant to 42 U.S.C. §§ 1982 and 1681, and dismissed the substantive due process, copyright infringement, patent infringement, breach of contract, promissory estoppel, educational malpractice and fraud claims. Plaintiff's remaining claims allege: (1) discrimination on account of his race and/or national origin; (2) retaliation for Plaintiff's assertion of a right protected by 42 U.S.C. § 1983; and (3) a violation of his right to due process of law.

## II.     STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedures governs motions for summary judgment. It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56( c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in her favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

With these standards in mind, the Court will address the pending motions.

## III.  DISCUSSION

### a.  Discrimination Claims

Plaintiff alleges violations of 42 U.S.C. §§ 1981 and 1983. As is relevant hereto, to succeed on his claims pursuant to §§ 1981 and 1983, Plaintiff must demonstrate discriminatory motive or that race or national origin was a factor in Defendants' conduct. Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993) ("To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute. . . ."); LaTrieste Restaurant and Cabaret, Inc. v. Village of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994); Wong v. Yoo, 649 F. Supp.2d 34, 68-69 (E.D.N.Y. 2009); Okolie v. Paikoff, 589 F. Supp.2d 204, 217 (E.D.N.Y. 2008) (equal protection claims under § 1983 and claims under § 1981 require proof of intentional discrimination).

Plaintiff lists certain matters he contends demonstrate a discriminatory motive by Defendants. These are addressed below.

### 1. Stipends

Plaintiff contends that he was "denied . . . stipend[s] in the amounts given to white students." Defendant counters this statement with the affidavit of Eisch who states that "I ensured that all of the graduate students in my laboratory received the same amount of funding (approximately $3,600) . . ., which was comparable to the funding received by students in other laboratories that summer." Eisch Aff. at ¶ 22. When asked at deposition for the factual basis for this statement, Plaintiff stated that it was generally known that other students received greater stipends and that he believed that students in Doetschman's group got $5,000 stipends. Plaintiff admitted that he had no personal knowledge of how much money any other student received. Plaintiff similarly was unable to identify any non-black or non-Nigerian students who received a larger stipend. Moreover, the undisputed record evidence is that Eisch secured increased funding for Plaintiff and that there were no white students in Eisch's group. The record is devoid of any evidence that any other students in Eisch's group received more than Plaintiff. Plaintiff's beliefs as to what other students received is insufficient evidence upon which a jury could reasonably conclude that white students received larger stipends.

Plaintiff's contention that his 2006 funding was reduced is belied by his admission at deposition that his 2006 funding increased from previous years. Plaintiff pointed to the fact that the University spread his payments out over the course of the year, rather than over the semester, thereby reducing the amount of each payment. When Plaintiff brought this issue to the attention of Defendants, it was immediately rectified. There are insufficient facts

concerning the stipends upon which a fair-minded trier of fact could reasonably conclude that race or national origin was a factor or consideration.

Lastly, there is insufficient evidence that the denial of any additional Fellowship funding beyond the spring 2007 semester was based on Plaintiff's race or national origin. Plaintiff was guaranteed Fellowship funding through December 2006, which he received. An additional year of funding was possible within the discretion of the Chemistry Department. Plaintiff did receive additional discretionary funding for the spring 2007 semester. While an additional semester of funding was possible, Plaintiff did not qualify because: (1) he did not request additional funding; and (2) the GPC concluded that his research would no longer be considered as satisfying the requirements for a Ph.D. Plaintiff identified two other person as having received Fellowship funding beyond five years - an Asian and a black male. In light of these undisputed facts, Plaintiff fails to point to sufficient evidence suggesting that the denial of any additional funding was based on improper reasons.

### 2. Publications

Plaintiff also contends that "while [he] was prevented from professional development through publications and presentations, no white student similarly situated was denied authorship or co-authorship and presentations in meetings. Such white students like Chris Buffy, Dan Brennan and Justin Martin completed their programs smoothly." At deposition, Plaintiff admitted that other, non-white students in Eisch's group were permitted to publish. The undisputed record evidence is that each of the other four African graduate students who worked in Eisch's laboratory while Plaintiff was in Eisch's group had their work published. Further, there is insufficient evidence upon which a fair-minded trier of fact could reasonably conclude that Eisch undertook efforts to prevent Plaintiff from publishing his

research or that, even if he did, there was a discriminatory motive. The undisputed evidence is that certain journals determined not to publish Plaintiff's submissions because he failed to seek Eisch's permission or list Eisch as a co-author. Further, Eisch did not approve of Plaintiff publishing his work because he did not believe it to be of a sufficient quality. The record evidence also unequivocally demonstrates that numerous non-white students "completed their programs smoothly." There is insufficient evidence upon which it reasonably can be concluded that Plaintiff's efforts to publish or pursue his professional development were impeded because of his race or national origin.

### 3.     External Examination of Plaintiff's Dissertation

Plaintiff next argues that his "dissertation was sent to an external examination while no white student had their dissertations sent to an external examiner." As noted, Plaintiff filed a grievance against Eisch for terminating Plaintiff's dissertation. As part of the mediation of the grievance, Plaintiff consented to review of his dissertation by an external reviewer. Although the process of external review may have been necessitated by Eisch's withdrawal as Plaintiff's faculty advisor,[4] there is evidence that this same procedure had been used in the past for a white student.

Even assuming no such process had been used in the past for a white student, there are insufficient facts concerning Plaintiff's grievance or the resolution thereof suggesting conduct on account of his race or national origin. There was an ongoing dispute between Plaintiff and Eisch and, arguably, other members of the Chemistry Department as to whether Plaintiff's work was of sufficient quality to warrant a doctoral degree. The parties

---

[4] Because Eisch withdrew as faculty advisor, an opinion in the specific area of study was no longer available from within the University's own chemistry department.

agreed to resolve the dispute by having the matter referred to an external advisor.  Nothing about this proposed procedure gives rise to an inference of unlawful discrimination.  Although Plaintiff believes the external reviewer to have been "idiotic" and to have performed an analysis that "was extremely mediocre both in logic and content," Pl.'s Mem. of Law at 10, there is no allegation or evidence that the external reviewer had a discriminatory motive or was otherwise unduly influenced by Defendants.

### 4. Denial of Teaching Opportunity

Plaintiff contends that he "was denied defense of doctoral dissertation and teaching opportunity at SUNY Oneonta while no white student was denied defense or jobs, in fact Dan Brennan was offered a teaching opportunity at SUNY Binghamton while still an ABD and was officially hired upon defense."  The overwhelming evidence is that Plaintiff was not permitted to pursue his doctoral dissertation because of performance deficiencies; not because of any animus regarding his race or national origin.  Numerous different persons, including Eisch, Whittingham, the external reviewer, and the other members of the Dissertation Committee concluded that Plaintiff's work was deficient.  Plaintiff's subjective beliefs and unsubstantiated allegations of unlawful motive aside, there is insufficient evidence tending to suggest that Plaintiff's pursuit of his doctoral degree was inhibited because of his race or national origin.  Out of the forty-five doctoral candidates who were pursuing their degrees in Eisch's group over the years (more than half of which were non-white students), only two left the group without a Ph. D.  Of these two, one was a Caucasian male and the other is Plaintiff.  These facts do not give rise to an inference of unlawful discrimination.

Moreover, contrary to Plaintiff's allegations, Mr. Brennan was not given a teaching position for the spring 2007 semester prior to having earned his Ph.D.  The undisputed

evidence is that, while Mr. Brennan worked as a teaching assistant while a graduate student (as did Plaintiff), he was not appointed as an adjunct lecturer until the spring 2007 semester. This was after he received his Ph.D.

### 5.  Grievance Procedure

Plaintiff contends that his grievance against Eisch was handled in a discriminatory manner and that he was denied the right to reinstate his grievance. As previously discussed, the record evidence demonstrates that Plaintiff's grievance was processed in accordance with applicable University policies and pursuant to the agreed-upon resolution between Plaintiff and Defendants. Plaintiff was unable to identify any white students who grievances were handled differently. Plaintiff presented insufficient other evidence tending to suggest unlawful discrimination.

### 6.  Discriminatory Comments

Plaintiff also asserts various discriminatory comments allegedly made or discriminatory actions or attitudes by certain of the Defendants. When pressed for specifics at his deposition, however, Plaintiff was unable to provide any details of any discriminatory comments or actions actually made.[5]  Plaintiff could not identify any comments that reasonably could by construed as based on race or national origin or that otherwise evidenced that Plaintiff was being treated differently than others because of his race or national origin. Plaintiff also was unable to identify white students treated more preferentially or situations when black or Nigerian students were treated less favorably than non-Nigerian

---

[5] At best, any specific comments (such as Jones's inquiry whether Plaintiff intended to work in the United States or Kenya) constitute "stray remarks" or innocuous comments that are insufficient to establish discriminatory intent. Tomassi v. Insignia Financial Group, Inc. 478 F.3d 111, 115 (2d Cir. 2007).

or non-black students. The record evidence is that, during Plaintiff's time at Binghamton University, there were other black students in Eisch's group (and in the Chemistry Department in general), all of whom successfully completed the program (with the exception of Plaintiff). The program also consisted of other students from Nigeria. Based upon a thorough review of the record, it appears that the sole bases for Plaintiff's conclusion that he was discriminated against are rumors and his personal assumptions, conclusions, and subjective beliefs.

Even considering the totality of Plaintiff's allegations, there is insufficient evidence upon which a jury could reasonably conclude that Defendants acted on account of Plaintiff's race or national origin. To the contrary, Defendants gave Plaintiff ample opportunity to improve his work and complete his doctoral research, overlooked his ethical transgressions, assisted him in obtaining extended Fellowship funding, and agreed to assist him in pursuing an M.S. or M.A. degree notwithstanding the shortcomings in his work. Upon reading all of Plaintiff's filings in this case, it is clear that the basis for his contention is founded upon his disagreement with Defendants' conclusions concerning the quality of his schoolwork.

### b.     Retaliation

Plaintiff claims that he was retaliated against for engaging in protected speech in violation of 42 U.S.C. § 1981. Plaintiff notes that he commenced litigation against Defendants in July 2007 and was severed from the University in March 2008, thereby evidencing retaliation.

Upon review of the totality of the circumstances, the Court finds that there is insufficient evidence upon which a fair-minded trier of fact could reasonably conclude that Plaintiff was dismissed from the University on account of his having filed a lawsuit. First,

Plaintiff commenced the lawsuit in July 2007.  Plaintiff was not dismissed from the University until March 2008.  The seven month period of time is insufficient to establish a causal relation between Plaintiff's protected conduct and his dismissal from the University.[6]

Second, even considering the timing between the filing of the lawsuit and the dismissal, where "timing is the only basis for a claim of retaliation, and gradual adverse . . . actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (discussing retaliation in the context of Title VII).  Here, the evidence demonstrates that Eisch raised issues concerning Plaintiff's performance and put Plaintiff on probation before Plaintiff filed his litigation.  Similarly, the GPC recommended dismissal from the graduate program before Plaintiff filed his state court litigation.  Accordingly, the timing issue does not give rise to an inference of retaliation.  Plaintiff points to insufficient other evidence suggesting a retaliatory motive.

Even if Plaintiff could point to such evidence, Defendants offer the legitimate, non-retaliatory explanation that Plaintiff was severed from the University pursuant to its standard policies whereby Chemistry Department students must maintain continuous registration each semester, students who do not maintain continuous registration are severed from the program, and, to be considered registered, students must pay all tuition and fees.  As previously discussed, Plaintiff did not pay the fall 2007 semester fees and, therefore, was

---

[6] Arguably this time period is greater than seven months because Plaintiff sent Defendant a letter of his intent to sue one month prior to commencing the litigation.  Although Plaintiff commenced the instant action in December 2007, three months before his dismissal from the University, the Court does not believe this filing to be relevant because Plaintiff makes virtually identical allegations in both his state and federal complaints, including allegations of discrimination.  Nevertheless, even using the three month period between December 2007 and March 2008, for the reasons stated herein, the Court finds that Defendants are entitled to summary judgment on the retaliation claim.

unable to register for spring 2008.  Accordingly, he did not maintain continuous registration and was severed from the program.  Plaintiff points to insufficient evidence suggesting that this was a pretext for retaliation.

For the foregoing reasons, Plaintiff's First and Second Causes of Action must be DISMISSED.

### c. Due Process

Plaintiff argues that he was denied due process of law because he was deprived of his status as a doctoral candidate without a fair hearing.  This contention is without merit. Plaintiff's work was continuously reviewed by Eisch, who found it to be deficient and terminated Plaintiff's work in the laboratory.  Plaintiff filed a grievance concerning Eisch's decision.  The parties agreed to a resolution of the matter which included, among other things, submitting Plaintiff's dissertation to an external reviewer.  The external reviewer reviewed Plaintiff's dissertation and determined that it was insufficient to support a doctoral thesis.

It is clear from the record evidence that Plaintiff had notice of the deficiency of his thesis and an opportunity to be heard through the grievance procedure.  The matter was resolved in accordance with this procedure.  Plaintiff, therefore, was afforded all the process that was due.  Moreover, for reasons previously discussed, there is insufficient evidence upon which it can reasonably be concluded that Plaintiff was dismissed from the doctoral program or severed from the University irrationally or because of ill-will or other improper motive.  See Clements v. Nassau County, 835 F.2d 1000, 1004 (2d Cir. 1987) ("In cases involving academic dismissal, educational institutional have the right to receive summary judgment unless there is evidence from which a jury could conclude that there was no

rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance."). Accordingly, Plaintiff's due process claim also must be DISMISSED.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED, Defendants' motion for summary judgment is GRANTED, and the Amended Complaint is DISMISSED IN ITS ENTIRETY. The Clerk of the Court shall close the file in this matter. IT IS SO ORDERED.

Dated: January 22, 2010

_____
Thomas J. McAvoy
Senior, U.S. District Judge